**In the Matter of the Care and Treatment of Dean MORGAN, a/k/a Dean D. Morgan, a/k/a Dean Delino Morgan, Respondent–Appellant.**

**No. SD 31761.**

Missouri Court of Appeals, Southern District, Division Two.

Jan. 24, 2013.

tory references are to RSMo. Cum.Supp.2006.

Erika R. Eliason, Columbia, MO, for appellant.

Timothy A. Blackwell, Jefferson City, MO, for respondent.

DON E. BURRELL, J.

Dean Morgan ("Appellant") appeals the judgment committing him to the custody of the Department of Mental Health after a jury found him to be a sexually violent predator ("SVP") (*see* section 632.480(5) [1]). Appellant contends the trial court erred in overruling his motion for a directed verdict at the close of the evidence because there was insufficient evidence clearly and convincingly demonstrating that it was more likely than not that Movant would commit a sexually violent act in the future in that the State's expert witness "greatly inflated

---

1. All statutory references are to RSMo Cum. Supp.2011.

[Appellant's] risk of reoffending[.]"[2] Because the appropriate weight of the challenged testimony was for the jury to determine, we deny the point and affirm the judgment.

### Applicable Principles of Review and Governing Law

As relevant here, the State was required to prove two statutory elements: 1) that Appellant "suffers from a mental abnormality which makes [him] more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility"; and 2) that Movant had pleaded guilty to "a sexually violent offense[.]"[3] Section 632.480(5)(a); *see also In re Care & Treatment of Berg v. State*, 342 S.W.3d 374, 381–82 (Mo.App. S.D.2011) (discussing the required mental abnormality). Felony sodomy is considered a sexually violent offense. Section 632.480(4).

 "Appellate review in an SVP case is limited to a determination of whether there was sufficient evidence admitted from which a reasonable jury could have found each necessary element by clear and convincing evidence." *In re Care & Treatment of A.B.*, 334 S.W.3d 746, 752 (Mo. App. E.D.2011). This means that the credibility of witnesses and the weight to be given to their testimony are for the jury to determine. *Id.* "This Court does not reweigh the evidence." *In re Care & Treatment of Gormon*, 371 S.W.3d 100, 103 (Mo.App. E.D.2012). Instead, "[w]e view the record most favorably to the judgment, disregarding all contrary evidence and inferences, and will not reverse for insufficiency of the evidence unless there is a complete absence of probative facts supporting the judgment." *In re Care & Treatment of Dunivan v. State*, 247 S.W.3d 77, 78 (Mo.App. S.D.2008).

### Facts and Procedural Background

The State filed its petition seeking Appellant's commitment in April 2009, and the matter was tried in November 2011. Dr. Rick Scott, a certified forensic examiner, testified on behalf of the State that he evaluated Appellant in September 2009. That evaluation consisted of a personal meeting with Appellant and a review of records related to Appellant from medical providers, the military, the Scott County Sheriff's Department, and the Department of Corrections. Dr. Scott was trained in how to perform evaluations of individuals for purposes of SVP proceedings, and he had been conducting such evaluations since 1999.

Dr. Scott learned that Appellant first had sexual contact with another child, a relative, when Appellant was ten years old and the other child was six years old. Appellant's sexual contact with this child continued over the course of ten years, and Appellant estimated that such contact had occurred in excess of "100 times." Appellant also molested his younger brother, who had an intellectual disability, both before and after the brother became an

---

**2.** Appellant's point refers to a motion for judgment of acquittal, but the motion filed during the trial of this civil matter was appropriately a motion for directed verdict at the close of the evidence.

**3.** The State must prove by clear and convincing evidence that a person is a SVP. Section 632.495; *see also In re Care & Treatment of Van Orden*, 271 S.W.3d 579, 586 (Mo. banc 2008). "Clear and convincing evidence is

evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *State v. Canchola*, 954 S.W.2d 691, 694 (Mo.App. W.D.1997) (reversing the unconditional release from a civil commitment following an acquittal based on mental disease).

adult. The reports revealed that Appellant had admitted that before he reached 17 years of age, he had engaged in sexual contact with five other children, including multiple instances of sexual contact with at least two of those children. One of these children, another female relative who was eight years old when the sexual contact started, "was told by her mother to stay away from [Appellant after the contact was discovered]. No other consequences occurred."

When he was between the ages of 17 and 20, Appellant had sexual contact with six other children. One of these children was the younger brother of the first child Appellant had sexual contact with. When the family finally discovered Appellant's behavior with the girl and told him to stop, he began sexually abusing the girl's younger brother, who was then eight years old. Appellant estimated that these incidents "happened between 50 and 60 times over a five-year period." When Appellant was 26 years old, he sexually abused one boy ("about eight or nine years old") on one occasion and another boy ("[n]ine to 10 years old") on another occasion after he had encountered the boys at a park.

Approximately three years later, in 1988, Appellant performed oral sex "a few times" on two neighbor boys, ages six and ten. Around the same time, he performed oral sex on a five-year-old girl. The events from 1988 resulted in three charges of sodomy. Appellant pleaded guilty to the offenses, and a copy of his conviction record was entered into evidence as State's Exhibit 2. Appellant was sentenced to consecutive seven-year sentences on each count, and his incarceration on those offenses ended in May 2009.

While in prison, Appellant completed "Phase 1" of the Missouri Sex Offender Program ("MOSOP"); the program involved "education and testing." Appellant began "Phase 2" of MOSOP in 2001, which was an "intensive" program of education, therapy, and application of therapy, but Movant "quit" Phase 2 in 2002. When Movant was offered a second opportunity to complete Phase 2, he "declined it." Appellant told Dr. Scott that he did so because it "was too much" for him to confront his behavior and "apply the principles of treatment on a day-to-day basis[.]" During a 2009 interview in prison, Appellant "said he wasn't sure if he could control his behavior or not control it." Appellant admitted to Dr. Scott that he still had "sexually oriented fantasies toward children[,]" and he masturbated to such fantasies. Dr. Scott made the general comment that "[t]here are at least 13 sets of victims," and Dr. Jarrod Steffan, Appellant's expert, acknowledged that there were "approximately 18 victims."

Dr. Scott diagnosed Appellant as having "[p]edophilia, sexually attracted to both male and female children, and nonexclusive type."[4] Dr. Scott testified that this was "a deviant sexual interest[.]" Dr. Scott included the qualification of "nonexclusive" because Appellant reported having one intimate relationship with an adult while they were both incarcerated. Dr. Scott testified that pedophilia can be either a congenital or acquired condition and affects an individual's "ability to control [his] behavior, the volitional component." Because such behavior with a child involving oral and genital contact "virtually equates to sexually violent behavior" under Missouri law, he agreed that it is understood

4. Dr. Scott testified that Appellant's diagnosis applies to a person who is "at least 16 years old, and their victims need[ ] to be under-at least five years younger." Dr. Scott further testified that "certainly after [Appellant] was 16 years old, he had numerous child victims, most in the five-, six-year-old, seven-year-old range, so [he] clearly meets that criteria."

as "predisposing a person to commit sexually violent offenses[.]"

Dr. Scott's method of evaluating Appellant was known as "anchored and adjusted, or adjusted actuarial[.]" This method combined "actuarial instruments" based on "static factors" with the consideration of additional information. Dr. Scott performed a risk assessment for Appellant using "two actuarial instruments" that "are research-based tools for assessing risks[,]" the Static–99R and the Static–2002R.[5] Appellant's scores from the Static–99R and the Static–2002R indicated a range of risk of "low moderate[,]" with the Static–99R suggesting a "predicted rate of risk" of a range between "8.8 to 15.9 percent" at the five-year mark and "15.6 to 21.2" at ten years. Results from the Static–2002R indicated that "[t]he five-year rate of reoffending ... was 13.0 percent, with a confidence interval of 10.0 of [sic] 16.8[,]" and "20.6 percent, with a confidence interval of 15.6 to 26.7" at the ten-year mark.

Static assessment is limited to a 10–year calculation. The risk actually assessed by static methodology is the "likelihood of being detected for a new sexual offense or arrest[ed] or convict[ed] for a new sexual offense over ... [the course of] five years and 10 years." Dr. Scott explained that examiners have "been trained to consider ... a lifetime risk, and [Appellant]'s would extend beyond 20 years at this point in his age." Dr. Scott related that a static assessment produces "an underestimate" of the risk that a person will actually commit a new offense because it does not account for unreported cases. Dr. Scott testified that an actuarial instrument relying on

static factors is the "most accurate with groups of offenders. You'll properly rank order a hundred—example, a hundred offenders, you'll rank order them in terms of who's most likely to reoffend and least likely to reoffend, absolutely." The doctor had not seen an "inherently sound" static tool that itself included "the dynamic factors shown to be effective[.]" Because precise numbers for unreported sexual offenses cannot be known, a figure accounting for that risk could not be "automatically" added in. Dr. Scott explained that "we have to individualize the evaluation. We can't just drop a number on him, say that's the score and go from there when we're talking about assessing one person."

Dr. Scott testified that "[t]here are a lot of other things that aren't on [the static assessments] that we also take into consideration in deciding how risky somebody is." The doctor testified that Appellant's pedophilia caused him serious difficulty in controlling his behavior. He explained that although Appellant's family members intervened more than once, and Appellant was arrested and incarcerated, he "cannot set aside his sexual interests now[.]" Dr. Scott observed that "as [Appellant] moved along, most of his victims were under the age of ten. And other than the one relationship he has reported in prison, the issue of adult relationships is important, because he hasn't had them." Dr. Scott also testified that Appellant "spent a considerable amount of his time sexually focused, and his focus was sexually deviant. His sexual preoccupation is itself a risk factor for reoffending." Additionally, he

---

**5.** Dr. Scott explained that "10 items comprise the Static–99R[,]" including such things as age, "relationship stability," "measures of prior violence[,]" prior sex offense charges, other criminal convictions, "non-contact sex offenses[,]" offenses against "stranger" victims, and offenses against male victims. The Stat-

ic-2002R has 14 items which partially overlap the Static–99R, but it also considers whether there were more than two victims under the age of 12, how quickly an individual reoffended, and the persistence of the offender's reoffending.

found that Appellant "lacks any problem-solving strategies." Appellant did not reduce his risk by successfully completing treatment and "[t]here's some evidence of low motivation for treatment."

Dr. Scott explained his analysis as follows:

> I see this as somebody whose risk is very current. Although he was in prison for 21 years and has been detained waiting for trial for another two, I believe that his sexual urges, his sexual interests and his motivation to be sexual with children remains very strong. As such, I think that the actuarial risk underestimates. You know, he didn't fall in the 85th, 90th percentile, as—as—as expected, which is not automatically in the high risk there, but I find that with all of these dynamic risk factors—the lack of problem solving plans and approaches and the fact that he has admitted very recently to continued sexual interest in children without any way of changing his lifestyle—I believe that he is actually a high-risk offender.[6]

Dr. Scott acknowledged that the level of a pedophile's urge to act could not be "captured empirically" and was made as a part of the doctor's "judgment." He testified that the other risk factors were "reasonably relied upon and are regularly published about in our field." He opined "that as a result of mental abnormality [Appellant] is more likely than not to commit predatory acts of sexual violence if not confined in a secure facility[,]"[7] and he concluded, "to a reasonable degree of psychological certainty[,]" that Appellant was a SVP.

Appellant presented the testimony of Dr. Steffan, who interviewed Appellant in 2010—"roughly a year after Dr. Scott had met with [Appellant.]" Dr. Steffan also reviewed records and used the Static–99R to assess Appellant's risk of recidivism. While Dr. Steffan did not think it more likely than not that Appellant would "engage in predatory acts of sexual violence if not confined in a secure facility[,]" he agreed with Dr. Scott's diagnosis of Appellant as a pedophile, and he agreed that Appellant had "serious difficulty controlling his sexual behaviors with children." Appellant also admitted in their interview that he was "still masturbating to thoughts of children." Dr. Steffan also admitted that Appellant had previously told Dr. Scott that when he was around children he did lose control of himself and that Appellant had reported to yet another doctor in 2009 that he did not know if he could control his sexual deviance. Dr. Steffan also acknowledged that Appellant's assessment under the Static–99R included no points for his convictions because they were not followed by additional detected instances of sexual abuse after "a criminal justice intervention[.]" Further, he acknowledged that the Static–99R added no points for sexually abusing all of the other children that had been identified as Appellant's victims.

Appellant's motion for new trial following the jury's verdict was denied. This appeal timely followed.

## Analysis

■ Appellant's point contends the State failed to prove that he "was more likely than not to commit a future act of

---

**6.** Dr. Scott testified that Appellant was in "approximately the 55th to the 71st percentile."

**7.** On cross examination, Dr. Scott testified that, to him, "more likely than not" meant "over 50 percent[,]" and he reiterated that it was more likely than not that Appellant would reoffend if released from custody.

sexual violence" because Dr. Scott's opinion relied on consideration of "multiple dynamic factors after admitting that the most accurate form of risk assessment is the pure actuarial method and the use [of] dynamic factors decreases the accuracy of the risk assessment." Appellant further argues:

> The testimony of Dr. Scott failed to tip the scales in the affirmative when weighed against the [other] amount of evidence ... because Dr. Scott was forced to double [Appellant's] Static–99R and Static–2002R scores and was unable to provide any data or studies that allowed for him to do so without decreasing the accuracy of his evaluation.

Appellant's point fails on both the facts and the law.

Dr. Scott did not admit that his method of evaluating risk using dynamic factors was less accurate than using only actuarial factors, and he was not "forced to double" his static assessment results in order to opine that Appellant was more likely than not to reoffend if released. Dr. Scott acknowledged the mathematical distance between the ranges produced by the static assessments and the "50 percent" figure, but he testified that examiners "don't automatically say it's some figure" because the precise figures for the risks unaccounted for in the static assessments cannot be known. He testified that the static assessment results should not be used by themselves to "just drop a number" for a risk measurement because they did not look forward as far in time as necessary to evaluate Appellant's lifetime risk, and they underestimate risk by not accounting for "undetected" offenses.[8]

Even Dr. Steffan agreed that the static assessment he used did not account for any of Appellant's convictions from 1988 or

all of the other sexual abuse of children identified in the case because these events were not preceded by or interrupted by an earlier conviction. Dr. Scott testified that he did not know of a sound static assessment that also included dynamic factors in order to produce a risk figure because a number could not be known for the rate of undetected offenses. As a result, Dr. Scott used an "anchored and adjusted, or adjusted actuarial" approach in evaluating Appellant's risk to reoffend.

Dr. Scott's opinion was that Appellant was "actually a high-risk offender[,]" and this opinion was supported by his findings that: 1) Appellant had recently admitted difficulty in controlling his behavior; 2) while Appellant had one intimate relationship with an adult while in prison, his sexual relationships in the community were exclusively pedophiliac; 3) Appellant remained sexually interested in children even after being incarcerated for more than 21 years; 4) Appellant had persisted in pedophilia even after he was "caught" by others; and 5) Appellant lacked (and had refused to learn) skills for changing his behavior. Dr. Scott testified that these reasons were in addition to "the underestimation associated with detected versus undetected offenses."

■ Although it appears that the trial court allowed Appellant to have a continuing objection to expert testimony concerning: 1) his difficulty in controlling his behavior; 2) the "alleged underestimation of actuarial risk estimates"; and 3) Appellant's relative risk as compared to other sex offenders, his point on appeal challenges the *weight* of Dr. Scott's opinions, not their admissibility. "Once an expert opinion has been admitted, as any other evidence, it may be relied upon for purposes of determining the *submissibility* of the case." *In re Care and Treatment of*

---

8. A juror could have reasonably inferred from this testimony that Dr. Scott used "undetect-

ed" in the sense of undetected by the legal system.

*O'Hara v. State*, 331 S.W.3d 319, 320 (Mo. App. S.D.2011) (emphasis as stated in original). Arguments on appeal criticizing an expert's testimony essentially ask us to "reweigh the evidence in [the appellant's] favor. We cannot do so." *In re Care and Treatment of Barlow v. State*, 250 S.W.3d 725, 734 (Mo.App. W.D.2008); *see also Gormon*, 371 S.W.3d at 103 (appellate review of a SVP commitment does not include reweighing the evidence). Once it was admitted, the jurors were entitled to give Dr. Scott's testimony whatever weight they believed it deserved. *See A.B.*, 334 S.W.3d at 752.

For the same reason, the jurors were not bound to accept Dr. Steffan's contrary opinion. *See id.* Such conflicting evidence represents "nothing more than a factual issue for the jury to resolve in determining which expert opinion to credit in making its decision." *In re Care and Treatment of Turner v. State*, 341 S.W.3d 750, 754 (Mo.App. S.D.2011). In *Turner*, the expert explained the basis for her opinion that an individual was more likely than not to reoffend based on "empirically-based dynamic factors" even though the static assessment score indicated a "moderate-to-low risk category." *Id.* at 752.

Dr. Scott's opinion that Appellant's pedophilia was a mental abnormality that made him more likely than not to commit another sexually violent offense if released was sufficient to allow a reasonable juror to find by clear and convincing evidence that Appellant was a SVP. *See O'Hara*, 331 S.W.3d at 320. Appellant's point is denied, and the judgment of the trial court is affirmed.

DANIEL E. SCOTT, P.J., and JEFFREY W. BATES, J., concur.