JEFFREY W. BATES, J.
Aaron Sebastian (Sebastian) appeals from a judgment committing him to the custody of the Department of Mental Health (DMH) after a jury found that he was a sexually violent predator (SVP). See § 632.480(5).[1] Sebastian presents 11 points for decision. For ease of analysis, we will consider some of Sebastian's points in combination due to the intertwined nature of the issues presented. The points can be grouped together into the following three *638 general categories: the evidence was insufficient to prove he was an SVP (Points 1 and 2); the trial court erred in the admission of evidence (Points 3 and 4); and various parts of the SVP law are unconstitutional (Points 5 through 11). The facts relevant to the various points will be included as a part of our discussion and disposition of the issues.
Sufficiency of the Evidence
Points 1 and 2 challenge the sufficiency of the evidence.[2] In relevant part, § 632.495.1 states that "[t]he court or jury shall determine whether, by clear and convincing evidence, the person is a sexually violent predator. If such determination that the person is a sexually violent predator is made by a jury, such determination shall be by unanimous verdict of such jury." Id . Because this case was tried to a jury, this Court "views the evidence in a light most favorable to the jury verdict, disregarding all contrary evidence and inferences, and determines whether the evidence was sufficient for twelve reasonable jurors to have believed beyond a reasonable doubt that [Sebastian] is an SVP." Murrell v. State , 215 S.W.3d 96, 106 (Mo. banc 2007) ; see also Matter of Mitchell , 544 S.W.3d 250, 252 (Mo. App. S.D. 2017) (in reviewing a jury's verdict in an SVP case, an appellate court determines whether there was sufficient evidence admitted from which a reasonable juror could have found each necessary element by clear and convincing evidence); In re Morgan , 398 S.W.3d 483, 485 (Mo. App. S.D. 2013) (same holding).
To commit Sebastian to DMH's custody as an SVP, the State had to prove that Sebastian: (1) committed a sexually violent offense; (2) suffers from a mental abnormality; and (3) this mental abnormality "makes [him] more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility[.]" § 632.480(5); Kirk v. State , 520 S.W.3d 443, 448-49 (Mo. banc 2017). There is no dispute that the State met the first element. Sebastian's underlying conviction was for attempted statutory sodomy in the first degree, which is defined by statute to be a "sexually violent offense[.]" § 632.480(4); § 566.062. With respect to the remaining elements, our Supreme Court has stated that the "language of section 632.480 is written in the present tense and necessarily requires the jury to find an individual presently poses a danger to society if released." Murrell , 215 S.W.3d at 104 (emphasis in original).
This Court will not reverse for insufficiency of the evidence unless there is a complete absence of probative facts supporting the judgment. Morgan , 398 S.W.3d at 485. In determining sufficiency, we do not reweigh the evidence. In re A.B. , 334 S.W.3d 746, 752 (Mo. App. 2011). "Matters of credibility and weight of testimony are for the jury to determine." Id . For that reason, we view the record in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences. Id . ; Morgan , 398 S.W.3d at 485. The following summary of evidence has been prepared in accordance with these principles.
When Sebastian was 14 or 15, he sexually abused his 9-year-old sister and two 8-year-old girls on different occasions. He performed oral sex on all three victims. He was caught and sent to a juvenile sex *639 offender treatment program. He was released at age 16. When Sebastian was 17, he sexually abused a fourth victim, a 7-year-old girl, "by pulling down her pants and penetrating her vagina with [his] tongue." When Sebastian was almost 19, he sexually abused a previous victim again, this time when the victim was 11 years old. Sebastian went into her room while she was sleeping, unbuttoned her pants, and put his hand down her waistband. She woke up, slapped his hand away, told him to stop and ran out of the room. Sebastian followed her and asked her not to tell anyone, but she called for her mother anyway.
Sebastian was charged for this offense, which occurred in 2011, and pled guilty to first-degree attempted statutory sodomy (hereinafter referred to as the index offense). He was sentenced for this offense and sent to prison, where he participated in the Missouri Sex Offender Program (MOSOP). Prior to his release from prison, the State filed a petition to commit Sebastian to the DMH as an SVP. The matter was tried to a jury in April 2016.
Two experts called by the State, Dr. Nena Kircher (Dr. Kircher) and Dr. Lisa Witcher (Dr. Witcher), testified at trial that Sebastian met the definition of an SVP. Both experts diagnosed Sebastian with pedophilia, a mental abnormality that predisposed Sebastian to commit a predatory, sexually violent offense if not confined in a secure facility. Sebastian presented testimony from his expert, Dr. John Fabian (Dr. Fabian), who provided contrary testimony. Viewing the evidence favorable to the verdict, and ignoring contrary evidence and inferences as we must, the expert testimony is summarized below.
Testimony of Dr. Kircher
Dr. Kircher, a licensed clinical psychologist, performed an SVP evaluation of Sebastian in December 2014. The doctor reviewed Sebastian's probation and parole records, as well as treatment records from Sebastian's participation in MOSOP. The records she reviewed were of a type reasonably relied on by members of her profession. Dr. Kircher also interviewed Sebastian.
Dr. Kircher used the diagnostic criteria in the DSM-5 to diagnose Sebastian with pedophilic disorder, sexually attracted to females, non-exclusive type.[3] She testified to a reasonable degree of psychological certainty that Sebastian's pedophilic disorder rose to the level of a mental abnormality.
Pedophilic disorder involves an interest in prepubescent children, generally 13 years or younger. To diagnose an individual with pedophilia, the individual must be 16 or older. Dr. Kircher noted that Sebastian had undergone juvenile sex offender treatment after being detected for an offense. Sebastian then committed: (1) a subsequent sex offense when he was 17 years old against a 7-year-old child; and (2) the qualifying sexually violent offense when he was 18. Dr. Kircher interviewed Sebastian while he was going through MOSOP treatment. He said that he was having an intrusive fantasy roughly every other week regarding a female child under the age of 12. According to Dr. Kircher, Sebastian's history demonstrated that he had either behaviors or fantasies involving prepubescent children for a period of at least five years. This met the diagnostic criteria of having recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a *640 prepubescent child or children. Dr. Kircher also pointed out that, with respect to pedophilic behaviors, an offense after 2011 would not have been possible because Sebastian did not have access to children in prison. Dr. Kircher testified that "[p]edophilia is something that doesn't go away. So if someone is attracted to children, that's just going to be there. The ideal of treatment is to give individuals tools to be able to deal with that attraction."
Dr. Kircher also described information obtained from her review of Sebastian's MOSOP records. Sebastian told his therapist that he became very preoccupied and driven to get sexual gratification when he was aroused. Sebastian reported that he became aroused during treatment when listening to another patient's discussion of his own offense against a teenage girl. Sebastian admitted in written disclosures that he had performed oral sex on his sister and two other girls multiple times as a juvenile, and that he had performed oral sex on a 7-year-old girl when he was 17. Sebastian told Dr. Kircher that he had a fantasy that the sister whom he had molested had grown up and had a daughter, and that he had molested that imaginary girl.
Dr. Kircher performed a risk assessment on Sebastian using the Static-99 to look at historical factors and the Stable-2007 to look at dynamic factors. She testified that both devices are widely used and are reasonably relied on by experts in the field.
Dr. Kircher gave Sebastian a score of four on the Static-99. The developers of the instrument had come up with several options for explaining what the scores meant. On the nominal risk scale, Sebastian's score placed him within the moderate high-risk category (at or above the 80th percentile). Sebastian's relative risk ratio was 1.94, meaning that he was roughly two times as likely as the typical sex offender to reoffend.
Because the Static-99 only looks at the likelihood of being charged with a sex offense in the next five to ten years, Dr. Kircher also looked at additional measures that would give Sebastian credit for the work he was doing in treatment. She used the Stable-2007 to measure factors which are more likely to change with treatment. Sebastian's score of 17 placed him in the nominal risk range of "high need" for treatment.
Dr. Kircher then performed a meta-analysis that created a list of risk factors associated with sexual offense recidivism. She opined that Sebastian's age increased his risk, as did his difficulty completing MOSOP. Dr. Kircher concluded that Sebastian had a great deal of trouble internalizing treatment concepts. Sebastian had admitted during a MOSOP session that he was attracted to a prepubescent girl featured in a music video and that he had not been able to articulate an adequate coping strategy. Based on Dr. Kircher's interview of Sebastian, she concluded that he did not have good insight into his own deviancy and did not have a good enough understanding to use the coping tools taught in MOSOP. For that reason, Dr. Kircher could not reduce Sebastian's risk based on his completion of MOSOP.
The additional concerns Dr. Kircher had about Sebastian included his indications of sexual preoccupation. He masturbated five to six times a week while in MOSOP. Dr. Kircher noted that required a lot of effort to orchestrate due to the lack of privacy in the prison setting.
Dr. Kircher also was told by Sebastian that he preferred sexual relationships with children because they were non-stressful and uncomplicated. Sebastian said that he decided to reoffend against the previous victim in the index offense because she had *641 not reported him when he had previously offended against her. In his mind, that meant she was okay with it. Dr. Kircher opined that Sebastian had completed juvenile sex offender treatment after that first incident, and he should have known from that treatment not to commit the second act. Dr. Kircher found this to be an indication that Sebastian had serious difficulty in controlling his behavior.
Sebastian had further difficulty forming relationships and receiving feedback during MOSOP sessions. According to Dr. Kircher, Sebastian's poor problem-solving skills increased his risk, as did his impulsive behavior and problems with self-regulation.
Dr. Kircher opined, within a reasonable degree of psychological certainty, that: (1) Sebastian was more likely than not to commit a future act of sexual predatory violence unless he was confined in a secure facility; and (2) Sebastian met the Missouri statutory criteria to be an SVP.
Testimony of Dr. Witcher
Dr. Witcher, a clinical psychologist with the DMH, evaluated Sebastian in July 2015. As part of that evaluation, the doctor reviewed records that were reasonably relied on by experts in her field. She also interviewed Sebastian.
Dr. Witcher relied on the criteria contained in the DSM-5 when she diagnosed Sebastian with pedophilia. She based that diagnosis on: (1) the index offense involving an 11-year-old girl; (2) Sebastian's admission that he had sexually offended against a 7-year-old girl; (3) Sebastian's statements during MOSOP treatment about having sexual fantasies regarding children; and (4) his viewing of a video while in MOSOP that he found to be sexually arousing. In the treatment records, Sebastian had indicated that he put his hand down the pants of the 11-year-old girl for "sexual gratification" and "happiness."
Dr. Witcher also discussed the two fantasies that Sebastian had reported. In one of the fantasies, Sebastian imagined that his 11-year-old victim in the index offense had not told him to stop, and that he was able to carry out the intended sexual act. Sebastian fantasized about that and how it would have felt. The other fantasy was one that he reported to Dr. Kircher about his sister having a daughter in the future. Sebastian fantasized about being asked to babysit, placing him in a sexual situation with this future niece.
The video by which Sebastian reported being aroused was one featuring a prepubescent girl dancing in a nude-colored leotard and nude-colored tights. This concerned Dr. Witcher because Sebastian continued to have access to the video after being aroused by it. When asked about whether Sebastian had any other pedophilic behaviors since 2011, Dr. Witcher answered that there were none because Sebastian did not have access to children while incarcerated.
Dr. Witcher also related information that, when Sebastian had sexual urges, he either acted on them or had experienced marked distress or interpersonal difficulty as a result of his sexual urges or fantasies. That information included: (1) Sebastian's incarceration for the index offense; and (2) his reprimand during MOSOP treatment for viewing the music video, which caused him distress because it resulted in a negative consequence.
According to Dr. Witcher, Sebastian's pedophilia rose to the level of a mental abnormality because it predisposed him to commit sexually violent offenses to a degree that caused him serious difficulty controlling his behavior. Dr. Witcher reached this conclusion based on "all the factors at hand," including the fact that Sebastian *642 had reoffended after being involved in juvenile sex offenses and going through juvenile sex offender treatment. Dr. Witcher opined that, while Sebastian's actions before age 16 could not be used as part of the pedophilia diagnosis, those actions could be used as part of the finding of a mental abnormality, because it showed that the behavior had been present throughout his life. Thus, Sebastian's actions before he was 16 years old, plus his subsequent offenses against a 7-year-old and an 11-year-old child after undergoing sex offender treatment, demonstrated a long-term pattern of behavior.
Dr. Witcher testified that Sebastian required an extended amount of time to complete both juvenile sex offender treatment and MOSOP. It took him eight months to complete what was supposed to be a four-month juvenile treatment program. It took him 12 months to complete MOSOP, which typically takes nine months to complete. In both treatment programs, it took Sebastian a while to get comfortable, to get motivated, and to show that he was making an effort. Dr. Witcher's interview of Sebastian did not demonstrate that he had been able to fully internalize the treatment concepts presented in MOSOP. Dr. Witcher found further relevant information on that point in Sebastian's MOSOP records, where he stated that he did not believe MOSOP's coping tools could be used in the real world. Dr. Witcher concluded that Sebastian's ability to apply what he learned in MOSOP was limited.
Dr. Witcher conducted a risk assessment based on Sebastian's records, the interview, and the Static-99R and Static-2002R actuarial instruments. Dr. Witcher gave Sebastian a score of five on the Static-99R.[4] The Static-2002R looked at more factors than the Static-99R, and the Static-2002R was reasonably relied on by experts in her field. Dr. Witcher gave Sebastian a score of seven on the Static-2002R. The makers of that instrument used risk category placement, ranging from low to high. Sebastian's score of seven fell in the moderate high-risk category to reoffend. The only thing that might arguably change a static factor would be the person's age.
Dr. Witcher also looked at research on dynamic risk factors that can change through time and found the existence of additional risk factors. A big factor was Sebastian's lack of social support. Another was "emotional congruence" with children because Sebastian believed that having sex with a child would cause the child to know that he cared about her. Sebastian also displayed a lack of emotional maturity by becoming irritated and defensive when given feedback during MOSOP treatment sessions. Other risk factors were Sebastian's difficulty presenting detailed information about his sex offender treatment and his history of reoffending after being in previous trouble. The fact that Sebastian victimized the same girl twice showed a lack of empathy and judgment. Dr. Witcher concluded that, to a reasonable degree of psychological certainty, Sebastian has a mental abnormality and is more likely than not to engage in future acts of sexually predatory violence unless confined in a secure facility.
Testimony of Dr. Fabian
Dr. Fabian was Sebastian's expert. While Dr. Fabian did not opine that Sebastian met the definition of an SVP, he corroborated a number of other facts upon which the State's experts, Dr. Kircher and Dr. Witcher, relied in forming their opinions. Dr. Fabian gave the following testimony *643 about Sebastian that was favorable to the jury's verdict. Based upon Dr. Fabian's review of records and other information, he agreed that Sebastian: (1) stopped touching the 11-year-old victim only because she woke up, slapped his hand away and ran out of the room; (2) admitted that high-risk situations for himself involve being around underage females; (3) offended against victims for sexual gratification; (4) was surprised that the victims had reported him because he thought they had enjoyed it; (5) "groomed" each of his victims "by portraying to be a perfect brother," offering to protect them and allowing them to play video games; (6) "said he would have victimized his undisclosed [7-year-old] victim more often if he had the opportunity"; (7) described a fantasy in which he was babysitting a niece, and he sexually offended against her; (8) struggled with MOSOP treatment and felt like he was making no progress; (9) in his eighth month of treatment, told his group members to "quit MOSOPing" him; and (10) in his tenth month of treatment, admitted to having a deviant sexual fantasy two to three times a week.
Point 1
Sebastian's first point contends that the "trial court erred in denying Sebastian's motion for a directed verdict and committing him to DMH as an SVP because the evidence was insufficient to make a submissible case[.]" Sebastian argues that the evidence was insufficient to prove he suffered from a "mental abnormality that made him more likely than not to commit predatory acts of sexual violence, as required by § 632.480, because expert testimony did not establish he presently suffered from a condition that caused emotional or volitional impairment and predisposed him to commit acts of sexual violence in a degree that caused him serious difficulty controlling that behavior." (Emphasis added.) According to Sebastian, "[e]ven if [his] past conduct, self-disclosed conduct, fantasies, [and] the music video supported pedophilia criteria, the State failed to establish that Sebastian was actively suffering from the diagnosis at the time of trial." To support this argument, Sebastian points to evidence that: (1) "Kircher's evaluation was 16 months old"; (2) there were "no pedophilic behaviors since 2011"; and (3) "[a]t most, the evidence may have supported a finding that Sebastian had pedophilia in the past." We find no merit in any of these arguments.
The evidence was sufficient for a reasonable juror to have found, by clear and convincing evidence, that Sebastian met the definition of an SVP at the time of trial. See Mitchell , 544 S.W.3d at 252. After interviewing Sebastian and reviewing his records, which were reasonably relied on by members of their profession, both Dr. Kircher and Dr. Witcher testified, to a reasonable degree of psychological certainty, that: (1) Sebastian has pedophilic disorder; (2) he has a mental abnormality; and (3) he is more likely than not to engage in future acts of sexually predatory violence unless confined in a secure facility. The jury was aware of the respective dates of the experts' evaluations. What effect, if any, those dates had in the credibility of the experts' opinions was a matter left to the jury in assessing the credibility and weight of that evidence. See Kirk , 520 S.W.3d at 460-61 (claims that expert opinions "were dated and uninformed were attacks on [expert's] credibility and the weight that should be afforded her opinions"); Matter of Sohn , 473 S.W.3d 225, 230 (Mo. App. E.D. 2015) (issues affecting the weight of expert's opinion are properly left to the jury). In addition, neither expert suggested that Sebastian's mental abnormality was in remission. See In re Care & Treatment of Spencer , 171 S.W.3d 813, 820 (Mo. App. S.D. 2005). In fact, Dr. Kircher testified that pedophilia "doesn't go away" and explained *644 that "if someone is attracted to children, that's just going to be there." While the "ideal of treatment is to give individuals tools to be able to deal with that attraction[,]" both Dr. Kircher and Dr. Witcher testified that Sebastian had not grasped the coping tools taught in MOSOP. Sebastian's own expert confirmed that several of Sebastian's fantasies involved children, that Sebastian struggled in MOSOP, and that, even after ten months of treatment, Sebastian admitted to having deviant sexual fantasies two to three times a week.
Sebastian complains about a lack of evidence of current behaviors, but proof of a recent overt act is not required when a putative SVP is incarcerated at the time the State's petition was filed. In re Kapprelian , 168 S.W.3d 708, 714-15 (Mo. App. S.D. 2005). Further, both Dr. Kircher and Dr. Witcher testified that a lack of recent pedophilic behavior would be the result of Sebastian not having access to children while incarcerated. See Spencer , 171 S.W.3d at 820 (the "mere fact that Spencer may have lacked access to young girls while incarcerated cannot logically support his claim that the State failed to establish any recent, overt sexual acts"); Kapprelian , 168 S.W.3d at 714-15 (doctor discounted "Kapprelian's ability to maintain control of himself in prison ... because it is common for pedophiles to be fairly well-behaved in prison and have few conduct violations when they are away from children"). Moreover, the evidence showed that Sebastian's offenses against three young girls within a year before he turned 16-although not the basis for diagnosis-showed an accelerated pattern that was interrupted only because he was caught. At 17, soon after his release from juvenile sex offender treatment, Sebastian resumed his behavior, offending again against a 7-year-old, before deciding to reoffend against his previous victim. Sebastian has since made very little progress with treatment and continued to fantasize about prepubescent girls. The jury was entitled to find, from the evidence presented at trial, that Sebastian was then suffering from pedophilia and that he was more likely than not to reoffend.[5]
*645 In sum, this is not a case in which "there is a complete absence of probative facts supporting the judgment." Morgan , 398 S.W.3d at 485. Based upon our review of the record, the evidence was sufficient for a reasonable jury to have found that Sebastian presently suffered from a mental abnormality that made him more likely than not to commit predatory acts of sexual violence if not confined in a secure facility. Point 1 is denied.
Point 2
Sebastian's second point contends the evidence was insufficient that he "suffered from a mental abnormality that made him more likely than not to commit predatory acts of sexual violence if not confined" because "the experts did not ... quantify 'more likely than not,' and the evidence did not demonstrate [Sebastian's] risk was 'more likely than not.' " According to Sebastian, the expert testimony must indicate that the "probability of re-offense must be greater than 50%." We disagree.
A similar argument was recently rejected in Nelson v. State , 521 S.W.3d 229 (Mo. banc 2017). There, Nelson argued that "even though the state's experts opined Nelson was 'more likely than not' to reoffend, the evidence was insufficient because the experts failed to define that they understood the phrase 'more likely than not' to mean a likelihood greater than 50 percent." Id . at 234. Our Supreme Court held that the jurors, credited with ordinary intelligence and common sense, as well as an expert, who is trained and experienced in applying the statutory definition of SVP, "can be trusted to give the phrase 'more likely than not' its plain and ordinary meaning[.]" Id .
Here, as set forth in detail above, both Dr. Kircher and Dr. Witcher concluded Sebastian was "more likely than not" to commit another sexually violent offense unless placed in a secure facility, and those opinions were amply supported by the facts of the case. Even though these experts did not state their opinions in terms of a precise, percentage likelihood that Sebastian would reoffend, the State offered sufficient evidence-combined with the jury's common sense understanding of the phrase-to determine Sebastian was "more likely than not" to commit future predatory acts of sexual violence if not securely confined. See id .[6] Point 2 is denied.
Evidentiary Challenges
Points 3 and 4 challenge the trial court's admission of evidence. The determination of whether to admit or exclude evidence is within the sound discretion of the trial court. Murrell , 215 S.W.3d at 109. An abuse of that discretion will not be found unless the ruling "is clearly against the logic of the circumstances ... and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id . Additionally, even if the trial court abused its discretion, this Court reviews for prejudice and not mere error. Id . at 109-10. The trial court's decision will be reversed only if the error was so prejudicial that it deprived the defendant of a fair trial. Id . Trial court error is not prejudicial unless there is a *646 reasonable probability that the trial court's error affected the outcome of the trial. Id . at 110.
When an expert witness has been deposed, and before trial he changes his opinion or bases his opinion on new or different facts, it is the duty of the party intending to use the expert witness to disclose that new information to the opposing party, thereby updating the responses made in the deposition. See Beverly v. Hudak , 545 S.W.3d 864, 869-70 (Mo. App. W.D. 2018) ; Rule 56.01(e) (duty to supplement when prior response "is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known"). When an expert provides different testimony from that disclosed in discovery, "then the trial court is vested with discretion to determine how to remedy the situation." Beverly , 545 S.W.3d at 870. The purpose of the principle is "to protect a party from the failure of an expert to disclose his opinion or the facts that he bases that opinion on during the discovery process." Sherar v. Zipper , 98 S.W.3d 628, 633 (Mo. App. W.D. 2003). Surprise exists when "an expert witness suddenly has an opinion where he had none before, renders a substantially different opinion than the opinion disclosed in discovery, uses new facts to support an opinion, or newly bases that opinion on data or information not disclosed during the discovery deposition." Id . at 634. Surprise, however, cannot be manufactured. "[T]he attorney deposing the witness must ask for the expert's opinion and/or the underlying facts or data." Id . A party cannot claim surprise based on "new opinions" as to matters about which the expert witness has not been asked during discovery. Id . To conclude otherwise is to promote "a form of sandbagging" in which counsel could ask general questions at the deposition but more specific questions at trial, then claim surprise at the response and seek to have the testimony excluded. Id . The principle requiring a party to disclose when an expert witness changes an opinion "is not intended as a mechanism for contesting every variance between discovery and trial testimony. Impeachment of the witness will accomplish that goal." Id . ; Beverly , 545 S.W.3d at 872.
Point 3
Sebastian's third point contends the trial court abused its discretion in ruling Dr. Witcher "did not change her opinion and permitting her to testify differently at trial than in her deposition," resulting in prejudice, in that "the State failed to disclose ... changes or supplement Dr. Witcher's deposition" after she testified: (1) as to "her opinions and the basis for them when deposed"; and (2) as to "an opinion relying on new/different facts as evidence of pedophilia, new sources of information, and different diagnostic criteria related to victims[.]" Because we find no change of opinion here, no supplementation was required.
This point arises out of the following facts. In a pretrial deposition, Sebastian's counsel asked Dr. Witcher what evidence she relied on for her diagnosis that Sebastian suffered from pedophilia. Dr. Witcher gave the following answer:
A I'm relying on the victim, slash-yeah, victims-victim, I'm sorry-of the victimization in the instant offense, combined with his undisclosed victim, combined with his legalization, his behavior in MoSOP, of the attraction, slash, arousal produced by the video of the 11-year-old girl.
Q Okay. So the undisclosed victim, the instant offense victim, and then the music video in MoSOP, those three things?
A Yes, ma'am. Those three things show his attraction and behavior.
Q Okay.
*647 A Or arousal. I'm sorry. Attraction/arousal.
Dr. Witcher was not asked any follow-up questions to determine if those were the only things in the record that supported the diagnosis of pedophilia.
The doctor was then asked if the cutoff for a diagnosis of pedophilia was the victim being the age of twelve and under. Dr. Witcher provided the following answer:
A ... [T]he age of 12. If it's 13 or over, I believe they-the criteria for the hebephilia. I'd have to look for certain, but 12 and under-I think I probably just said 12 and under based on the fact that that's part of the-yeah, the prepubescent mark.
Q Okay. And so I understand it, we're not so much concerned about how old these people are but what their physical development is. Are they prepubescent or have they entered into puberty, correct?
A Very good, yes.
When asked whether her opinion would change based on evidence that the 11-year-old victim of the index offense had entered puberty, Dr. Witcher responded that she would have to see the records. Sebastian questioned Dr. Witcher about records of the victim's SAFE exam and asked the doctor if she would agree that the victim was not prepubescent. Dr. Witcher said she would have to do more research on it.
At trial, Dr. Witcher testified that she used the diagnostic criteria in the DSM-5 for pedophilic disorder in reaching her opinion. She agreed that the diagnostic criteria was the following:
Over a period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges or behaviors involving sexual activity with a prepubescent child or children, generally 13 years or younger.
When asked if she found any evidence in Sebastian's case to support that criteria, Dr. Witcher testified that she found evidence of: (1) his index offense where he attempted to engage in sexual activity with an 11-year-old girl; and (2) Sebastian's own discussions of offending against a 7-year-old girl. Dr. Witcher then began to describe notes from Sebastian's MOSOP records and his interview with Dr. Kircher, where Sebastian discussed having two fantasies involving children.
Sebastian objected that Dr. Witcher's trial testimony was inconsistent with her deposition testimony because she had not mentioned the two fantasies in the deposition. The State responded that Dr. Witcher had not changed her opinion, and that any inconsistencies that Sebastian believed existed were subjects for cross-examination. The trial court reviewed the deposition and concluded that Dr. Witcher had not changed her opinion. The court overruled the objection.
Dr. Witcher went on to testify, based on the notes from her interview of Sebastian, that Sebastian had discussed a fantasy he had at the beginning of his MOSOP treatment. In this fantasy, the victim of his index offense had not told him to stop and he had touched her. Dr. Witcher said she also asked Sebastian in their interview about another fantasy he had relayed to Dr. Kircher about being placed in a sexual situation with a future non-existent niece. Dr. Witcher further testified about how Sebastian's self-reported behavior of performing oral sex on a 7-year-old girl supported the diagnosis of pedophilia.
Dr. Witcher acknowledged on cross-examination that she had not mentioned the fantasies in her deposition. She was also asked about her deposition testimony concerning the age of the victim and prepubescent development. Dr. Witcher said that the DSM-5 did not fully state that physical development was more important than age, and that the DSM-5 criteria *648 included that the child generally be under the age of 13. Dr. Kircher also explained her response to a related question in her deposition. Specifically, her deposition response of "Very good, yes" meant that physical development is "a good thing for us to look at" but noted that she had also said that there was other information not available to her at the deposition that she would have to look at to see if the diagnosis would change.
In the first subpart of this point, Sebastian argues the trial court abused its discretion in permitting Dr. Witcher to testify about Sebastian's sexual fantasies at trial because she did not mention them in her deposition. We find no abuse of discretion. Dr. Witcher offered the same opinion at trial as she did at the deposition. Because Dr. Witcher was never directly asked in the deposition whether the three factors then discussed were the only factors that supported her diagnosis, the deposition testimony did not establish the doctor was limited to only those three factors. See Sherar , 98 S.W.3d at 635 (doctor offered materially the same ultimate opinion when questioned both times). In addition, the fantasies that Dr. Witcher discussed at trial did not change her opinion, but were merely relied upon as an additional factor to reinforce it. See, e.g. , Tax Increment Fin. Comm'n of Kansas City v. Romine , 987 S.W.2d 484, 487 (Mo. App. W.D. 1999) (no abuse of discretion in permitting an expert to testify about an additional piece of information not considered at time of deposition to support opinion that remained unchanged); cf. Darnaby v. Sundstrom , 875 S.W.2d 195, 203 (Mo. App. S.D. 1994) (finding that trial court erroneously excluded evidence that reinforced, but did not change, expert's opinion); see also Eagan v. Duello , 173 S.W.3d 341, 347 (Mo. App. W.D. 2005) (testimony that interprets or supports opinions contained in depositions is not improper); Blake v. Irwin , 913 S.W.2d 923, 931-32 (Mo. App. W.D. 1996) (same holding). After overruling Sebastian's objection, the court allowed Sebastian ample opportunity to impeach Dr. Witcher over her failure to discuss the fantasies during her deposition. See Beverly , 545 S.W.3d at 872 ; Sherar , 98 S.W.3d at 634. We find no abuse of discretion in so ruling.[7]
In the second subpart of this point, Sebastian claims that Dr. Witcher changed her testimony about the criteria for a pedophilia diagnosis. Sebastian did not object when Dr. Witcher testified about the DSM-5 criteria that she used in her diagnosis. Sebastian instead raised the alleged inconsistencies in cross-examination. He complains that Dr. Witcher testified in her deposition that physical development, rather than age, was the important factor in determining prepubescence, but stated on cross-examination that anyone under the age of 13 qualified as prepubescent. We disagree with Sebastian's account of Dr. Witcher's deposition testimony. She never explicitly agreed with counsel's suggestion at the deposition that physical development was more important than age in determining whether someone was prepubescent. As Dr. Witcher explained at trial, her response of "Very good" was simply an acknowledgment *649 that physical development was a good thing to look at. Dr. Witcher further noted on redirect examination that Tanner stages are not part of the DSM-5's criteria and that she was not allowed to add to those criteria. Dr. Witcher's trial testimony was not inconsistent with her deposition testimony.
Thus, Sebastian failed to show that the trial court's ruling concerning Dr. Witcher's challenged testimony was "clearly against the logic of the circumstances [and] so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Murrell , 215 S.W.3d at 109.[8] Finding no abuse of discretion, Point 3 is denied.
Point 4
Sebastian's fourth point contends the trial court abused its discretion in overruling Sebastian's objection and admitting Dr. Kircher's testimony because "any opinion at trial was different than her opinion disclosed during her deposition." This contention has no merit. The following facts are relevant to this point.
As part of Dr. Kircher's evaluation of Sebastian, she completed an end-of-confinement (EOC) report. At that time, she was employed by a private company that contracted to provide services within the Missouri Department of Corrections. By the time Sebastian took her deposition, Dr. Kircher had taken a new job at the DMH and, under the federal HIPAA law, no longer had access to the records that she had reviewed in evaluating Sebastian. Dr. Kircher also did not have access at the time of her deposition to the EOC report she had written. During the deposition, Dr. Kircher stated that she was unable to speak to many of the details of her evaluation of Sebastian because she did not have access to the records of that evaluation. Sebastian's counsel indicated that she would have questions to ask Dr. Kircher if Dr. Kircher received the records. Dr. Kircher was provided access to those records after the deposition and reviewed them prior to trial. The record reflects no attempt to re-depose her.
At trial, Sebastian objected when Dr. Kircher was asked about her diagnosis of Sebastian. Counsel told the court that Dr. Kircher had been unable in her deposition to provide a current opinion regarding Sebastian. The State's attorney clarified that he was asking Dr. Kircher to testify to the diagnosis that she made at the time she wrote her report. Sebastian's counsel acknowledged having that report when she took Dr. Kircher's deposition. The court ruled that Dr. Kircher could testify about the opinion she had at the time her written opinion was issued.
Dr. Kircher did not, as Sebastian contends, testify at trial inconsistently with her deposition. Dr. Kircher made clear that her inability to recall details of Sebastian's evaluation was due to the fact that she did not have access to the records she relied upon in making that evaluation. Sebastian was aware of that and could have sought to re-depose Dr. Kircher after she did receive access to those records. Indeed, counsel mentioned that possibility, but did not do so. Counsel cannot now use the deposition as a means to exclude Dr. Kircher's testimony. See Sherar , 98 S.W.3d at 634 (as a form of sandbagging). Moreover, Sebastian cannot claim surprise *650 from Dr. Kircher's testimony, since it was limited to the opinion given in her EOC evaluation, to which Sebastian had access at the time of the deposition. The trial court did not abuse its discretion in permitting Dr. Kircher to testify to those opinions.[9] Point 4 is denied.
Constitutional Challenges
In Points 5-11, Sebastian contends the trial court erred in denying his motion to dismiss based on constitutional violations. Specifically, he claims his constitutional rights were violated because: "evidence of [his] release plan" specifying an alternative "secure facility" was improperly excluded (Point 5); "the [SVP] Act is punitive" (Point 6); the Act "does not provide a least restrictive treatment environment" (Point 7); " 'beyond a reasonable doubt' is the only burden of proof that protects the interest at stake and against the risk of erroneous decision" (Point 8); the Act "permits commitment because of emotional capacity, without any proof of behavioral impairment, and fails to require proof of serious difficulty controlling behavior" (Point 9); the trial court granted the State's request for a jury trial, "forcing Sebastian to be tried by a jury" (Point 10); and the Act required the court to give an instruction that "informed the jury of the legal consequence of their verdict" (Point 11).
All of these claims have been heard and decided adversely to Sebastian's positions; six by our Supreme Court, and one claim recently decided by other districts of this Court. Kirk , 520 S.W.3d 443 (addressing Point 5 at 454-56, Point 6 at 449-50, Point 7 at 450-51, Point 8 at 452, Point 9 at 451, and Point 11 at 457-58); Nelson , 521 S.W.3d 229 (addressing Point 5 at 235-36 and Point 6 at 232); Derby v. State , 557 S.W.3d 355, 2018 WL 3026902, *6-7 (Mo. App. W.D. June 19, 2018) (addressing Point 10, claiming a "right to a bench trial"); Matter of J.D.B. , 541 S.W.3d 662, 672 (Mo. App. E.D. 2017), transfer denied (Apr. 3, 2018) (addressing Point 10, concerning a jury trial demand).
This Court is constitutionally bound to follow Kirk and Nelson as the latest controlling decisions of the Supreme Court of Missouri on these issues. MO. CONST. art. V, § 2 ; Inman v. Dominguez , 371 S.W.3d 921, 925 (Mo. App. S.D. 2012). We, therefore, need not consider or address Sebastian's arguments contrary to the holdings in Kirk and Nelson . With respect to the decisions made by the western and eastern districts in Derby and J.D.B. on the jury trial issue, we agree *651 with those decisions and follow them here.[10] Points 5-11 are denied.[11]
The judgment of the trial court is affirmed.
NANCY STEFFEN RAHMEYER, C.J./P.J.-DISSENTS IN SEPARATE OPINION
WILLIAM W. FRANCIS, JR., J.-CONCURS
DISSENT

All statutory references are to RSMo Cum. Supp. (2013). All rule references to Missouri Court Rules (2018).

In Addington v. Texas , 441 U.S. 418, 432-33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the United States Supreme Court held that a clear and convincing burden of proof is sufficient for a civil commitment proceeding to pass constitutional muster. In 2006, that standard of proof was adopted in § 632.495. 2006 Mo. Laws 359.

The acronym "DSM-5" refers to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. This publication is widely used for diagnosis in psychology and psychiatry.

On this same test, Dr. Kircher gave Sebastian a score of four, placing him within the moderate high-risk category of reoffending (at or above the 80th percentile). We note that Dr. Witcher gave Sebastian an even higher score of five.

Sebastian also challenges his pedophilia diagnosis by arguing that the 11-year-old victim in 2011 had already "entered into puberty ... presented with Tanner Stage 4 [development,]" which meant she "was not prepubescent." This argument fails for two reasons. First, the argument is directed at the factual and scientific bases for the expert opinions of Dr. Kircher and Dr. Witcher. These foundational issues concerning admissibility are not germane to, and consequently will not be reviewed as a part of, a point challenging the submissibility of the State's case. See Mitchell , 544 S.W.3d at 257 (an appellant cannot "back door" an issue relating to admissibility of expert testimony under guise of a sufficiency of the evidence argument). Sebastian did not object to the admission of either expert's diagnosis on these specific grounds. Instead, defense counsel cross-examined each expert extensively on the subject. Once opinion testimony has been admitted, it may be relied upon for purposes of determining the submissibility of the case just like as any other evidence. Id . The weight to be given to the testimony is a consideration for the jury. Id . at 258 ; see also Sohn , 473 S.W.3d at 230 (questions as to the sources and bases of an expert's opinion affect the weight, rather than the admissibility, of the opinion, and are properly left to the jury). In our discussion of this first point, we address only those arguments challenging the submissibility of the case to establish that Sebastian presently meets the definition of an SVP. Second, Sebastian's argument asks this Court to rely on evidence and inferences contrary to the verdict, ignoring our standard of review. A.B. , 334 S.W.3d at 752. Both Dr. Kircher and Dr. Witcher testified that Tanner stages are not included in the DSM-5 criteria, and the age of the victim is still a relevant criteria. Moreover, Sebastian's argument ignores his own admission to Dr. Kircher that he decided to reoffend against his previous victim because she had not reported him and he thought that she was okay with it-not because he was no longer attracted to prepubescent girls, as his argument suggests. The jury was entitled to believe all of this testimony, along with other evidence, to support the pedophilia diagnosis.

Sebastian's Point 2 includes additional arguments that the State failed to prove Sebastian met the definition of an SVP "because the experts did not assess for risk caused by a mental abnormality" or "risk of future predatory sexually violent acts[.]" These additional arguments are simply refuted by the record. Both experts testified extensively regarding these aspects of an SVP. See, e.g. , Nelson , 521 S.W.3d at 233-34 (rejecting similar arguments based on evidence from both experts).

Moreover, Sebastian failed to establish prejudice by demonstrating there was a reasonable probability that the trial court's failure to exclude the challenged testimony affected the outcome of the trial. Murrell , 215 S.W.3d at 110. Dr. Witcher's opinion would have remained the same had the evidence been excluded. Furthermore, Dr. Witcher's testimony reiterated, in part, the fantasy involving his future niece that Dr. Kircher already disclosed and Dr. Fabian confirmed without objection. See, e.g. , Martin v. Mercy Hosp. Springfield , 516 S.W.3d 403, 407 (Mo. App. S.D. 2017) (no abuse of discretion in admitting challenged testimony that was cumulative and not prejudicial).

Sebastian's Point 3 includes a third subpart, arguing that Dr. Witcher "changed part of her opinion since deposition[.]" Specifically, Sebastian claims that Dr. Witcher changed the identity of the 7-year-old victim in order to support her opinion. The record does not support that assertion. There was simply a mix-up as to the names of victims, not their ages. Like Sebastian's previous argument, this was not a matter to which Sebastian objected, but which was instead explored and clarified on cross-examination.

Sebastian's Point 4 goes on to posit abuse of discretion in admitting Dr. Kircher's testimony because "this violated his right to due process, assistance of counsel, to silence and equal protection" in that: (1) Dr. Kircher's EOC determination was "inadmissible under § 632.483 ... not reliable because scope of her evaluation was limited to the finite moment in time [and] only for the purpose of referring him into the process" and "could not assist the jury in determining if Sebastian presently met the criteria for commitment under § 632.480"; (2) "Sebastian did not have substantive protections at the time of her questioning, like a criminal defendant"; (3) "his statements were unwarned and involuntary"; and (4) "his communications with her were privileged under § 337.055[.]" We need not address these four arguments because each has been rejected in other cases. See Kirk , 520 S.W.3d at 460-61 (admissibility of EOC determination); Derby v. State , 557 S.W.3d 355, 2018 WL 3026902, at *7-9 (Mo. App. W.D. June 19, 2018) (criminal protections and privileged statements); Matter of J.D.B. , 541 S.W.3d 662, 671 and 675 (Mo. App. E.D. 2017) (criminal protections and privileged communications); see also Matter of Care & Treatment of Martin Reddig v. State , 550 S.W.3d 107, 2018 WL 1516831, at *6-8 (Mo. App. S.D. Mar. 28, 2018) (admissibility of EOC determination and criminal protections).

With respect to Derby and J.D.B. , we agree with those Courts' analyses of similar arguments raised by Sebastian in Point 10 concerning his claim that he was forced "to be tried by a jury[.]" In addition, we question whether Sebastian preserved the issue in this case. "[T]he rule is clearly established that in order to preserve a constitutional issue for appellate review, it must be raised at the earliest time consistent with good pleading and orderly procedure and must be kept alive during the course of the proceedings." State v. Liberty , 370 S.W.3d 537, 546 (Mo. banc 2012) ; see also In re Care & Treatment of Schottel , 159 S.W.3d 836, 841 n.3 (Mo. banc 2005). In the year leading up to trial, Sebastian participated in two jury-trial settings without raising the issue, and filed a motion to overrule the State's request for a jury trial and to request a bench trial less than a month before trial.

At oral argument, Sebastian's counsel conceded that the arguments raised in these points were not unique to this case and had already been decided against him.